# CIRCUIT COURT OF FAIRFAX COUNTY

In re Estate of
Cornelius A. Dolby

December 8, 2008

Case No. CL 2007-14850

BY JUDGE ROBERT J. SMITH

On December 12, 2007, the Estate of Cornelius A. Dolby filed a Petition for Aid and Direction in this court, seeking a determination as to whether the debt underlying a deed of trust entered into solely by the decedent and secured by real property that the decedent and his surviving spouse held as tenants in the entirety with right of survivorship is attributable to the decedent's estate or his surviving spouse.

I have carefully considered the pleadings, the briefs, stipulation of facts submitted by the parties, the evidence presented in court, and the arguments of counsel. For the reasons below, I find that the indebtedness underlying the deed of trust is not an obligation of the Estate.

*Background*

This recitation of the facts is based on the parties' joint stipulation of the facts, as well as evidence received in court.

Cornelius "Al" Dolby died testate, age 63, on December 25, 2006. He was survived by his second wife of eleven months, Christine Greenlaw Dolby, and three adult daughters from his first marriage, Catherine Dolby, Kimberly Lauth, and Heather Kho ("the Dolby children").

During his life, Mr. Dolby was a successful commercial real estate developer who owned and operated his own development business. He had been married approximately thirty years when his first wife died in 1994. In

the late 1990s, Mr. Dolby began dating his long time employee, Christine Greenlaw. In 2001, Mr. Dolby suffered a stroke, which left him unable to speak or walk. With the assistance of Ms. Greenlaw and many months of grueling rehabilitation, Mr. Dolby taught himself to walk again, but continued to have difficulty speaking. Despite this lingering impediment, Mr. Dolby remained competent.

In January 2002, Mr. Dolby created the Cornelius A. Dolby Revocable Inter Vivos Trust ("the Living Trust"), which provided considerably for Ms. Greenlaw even though they were not married. The Dolby children, as well as Ms. Greenlaw's adult children from a previous marriage ("the Greenlaw children"), were also beneficiaries of the Living Trust.

In June 2002, Mr. Dolby bought property on Brookewood Court in McLean, Virginia, which is the subject of this litigation. He and Ms. Greenlaw were in the process of building a house at another address, but Mr. Dolby had long admired the Brookewood property, and, when it became available he bought it. He titled it in his sole name and executed a deed of trust in favor of Chevy Chase Bank to secure a note in the principal amount of approximately $1.57 million. Shortly thereafter, Mr. Dolby and Ms. Greenlaw moved into the house together on Brookewood Court.

On December 20, 2005, Mr. Dolby refinanced the note secured by the deed of trust on the house. As a result, Mr. Dolby paid the Chevy Chase Bank note in its entirety and executed a new deed of trust in favor of Washington Mutual to secure a note in the principal amount of approximately $1.75 million (the "Washington Mutual mortgage"). The note and deed of trust were both taken solely in Mr. Dolby's name and contained so-called "due-on-sale" clauses, which permitted Washington Mutual to accelerate the debt secured by the deed of trust if Mr. Dolby sold or otherwise transferred his interest in the house.

On January 11, 2006, Mr. Dolby married Ms. Greenlaw, which put some strain on the Dolby children's otherwise close relationship with their father. As a result, Mr. Dolby and his daughters spent less time together, but still remained on good terms.

On August 28, 2006, Mr. Dolby conveyed his house by special warranty deed, for good and valuable consideration, to himself and Mrs. Dolby as tenants by the entirety with right of survivorship. Although the deed was duly recorded, it is unclear if Washington Mutual was otherwise informed of the change in ownership interest. Mrs. Dolby was not added as a joint obligor on the note, nor did she assume the obligation, as Mr. Dolby alone continued to make the mortgage payments on the house.

On September 19, 2006, Mr. Dolby amended the Living Trust ("Amended Living Trust") and executed a Will. The Will bequeathed to Mrs. Dolby all of Mr. Dolby's personal property and directed that the residuary estate pour over to the Amended Living Trust and be disbursed according to its complex terms.

On November 11, 2006, Mr. Dolby suffered a second stroke, from which he never recovered. He died from complications of the stroke on Christmas Day, 2006.

In January 2007, Mrs. Dolby, together with the decedent's brothers, Kent Dolby and Kirkmon Dolby, qualified as co-executors of the Estate of Cornelius A. Dolby. Mrs. Dolby and Kent Dolby also serve as co-trustees of the Amended Living Trust.

As the surviving tenant by the entirety, Mrs. Dolby received the house in fee simple by operation of law. She also received approximately $3 million in life insurance proceeds, as well as various continuing distributions from the Amended Living Trust. The Dolby children have yet to receive any distributions from the Estate and/or Amended Living Trust, because their share is largely dependant upon the amount of the residuary estate.

The balance of the Washington Mutual mortgage, at the date of death or at present, is unclear. However, it has been represented, without objection, that it was a negative amortization loan and the current balance may be somewhat higher than the initial principal of $1.75 million. The value of the house at the date of death was estimated to be $2.89 million. The parties do not dispute that the Estate could be rendered insolvent if required to pay the Washington Mutual mortgage and that, as a result, the Dolby children would likely receive, at the Estate's best estimate, approximately $670,000 to share between them, a difference of about $2 million.

*Analysis*

The Estate takes no position in this matter, but provided the court with an informative brief outlining the progression of applicable case law and statutory authority.

Mrs. Dolby contends that the decedent was personally and solely liable on the mortgage and, therefore, the decedent's Estate must pay the debt in its entirety, or in the alternative, a one-half contribution. She notes that Virginia Code § 64.1-157(9) requires Mr. Dolby's co-executors to pay his debts, including, she argues, the Washington Mutual mortgage. Mrs. Dolby also relies upon *Pickett v. Spain*, 254 Va. 107, 487 S.E.2d 233 (1997), for the

proposition that a surviving tenant by the entirety has a common law right of contribution against a decedent's estate even where a will directs the decedent's executor not to pay a jointly held mortgage debt.

The Dolby children believe that the mortgage runs with the land and argue that Mrs. Dolby is responsible for the Washington Mutual mortgage as the fee simple owner of the house or, in the alternative, at least half of the obligation.

In Virginia, the personal estate of a decedent is the primary fund for the payment of his debts, even though the debts may be secured by a lien on real estate, absent testamentary direction to the contrary. *Brown v. Hargraves*, 198 Va. 748, 96 S.E.2d 788 (1957).

In *Owen v. Lee*, 185 Va. 160, 37 S.E.2d 848 (1946), the Supreme Court of Virginia stated that the rule in Virginia is that *"in the absence of a contrary testamentary direction, the personal estate of a decedent is the primary fund for the payment of his debts, even though they may be secured by a lien given by the decedent in his lifetime on real estate." Owen*, at 164 (emphasis added).

Although the parties have cited various cases in support of their respective positions, they all agree that no Virginia authority is squarely on point; that is, there are no cases where property held by tenants by the entirety provides security for a note taken in the name of only one of the entirety tenants prior to the creation of the tenancy. This is presumably because, when a property interest subject to a deed of trust is alienated, the lender would require a new note to be executed to reflect the change in interest and, potentially, the change in credit risk. Indeed, no authority from other jurisdictions or secondary sources has been cited to the court on this precise issue.

In *Brown v. Hargraves, supra*, the Supreme Court of Virginia held that the surviving joint tenant had a right of contribution against the deceased joint tenant's estate for one-half the notes on which they were jointly and severally liable. *Id.* at 752. The Court focused on the unique relationship existing between joint tenants, calling it a "joint enterprise," which, if compromised, would entitle an aggrieved joint tenant to contribution from the other. *Id.* at 751.

Forty years later, the Court extended the *Brown* holding to surviving tenants by the entirety, explaining that the surviving spouse had "a common law right of contribution against [her husband's estate] because she was a co-maker of the notes which were secured by deeds of trust on property owned [as tenants by the entirety] with right of survivorship." *Pickett v. Spain*, 254 Va. 107, 110, 487 S.E.2d 233 (1997).

The Court recently reaffirmed that extension in *Caine v. Freier*, stating that, "because [the deceased entirety tenant's] estate is liable for his debts, and the proceeds of his personal estate are primarily liable for paying them, [the surviving entirety tenant] is entitled, under the right of contribution, to have his personal estate charged with liability for one-half of the joint indebtedness evidenced by the [deed of trust] note in question." 264 Va. 251, 259-60, 564 S.E.2d 122 (2002). In doing so, the Court impliedly rejected the view that common law contribution is inapplicable to tenancies by the entirety because such tenants are seised of such lands in their entirety and not in equal undivided portions, as in a joint tenancy.

However, *Brown* and its progeny are *contribution* cases, where the surviving tenants were *jointly liable* for the underlying indebtedness. Here, Mrs. Dolby essentially argues the Estate should exonerate the mortgage debt on her survivorship property. In such cases, an exception to the general rule exists: a decedent's personalty is not to be used for the payment of his debts "when to do so w[ould] defeat the manifest intention of the testator." *Kellam v. Jacob*, 152 Va. 725, 731, 148 S.E. 835 (1929) (exoneration not warranted when it would destroy testamentary intent).

In *Kellam*, a will construction case, the testator devised various properties to his five adult children that were "about equal in value." *Id.* at 728. However, on the date of testator's death, some of the properties were encumbered by deeds of trust securing various sums of money, which, if exonerated by the testator's personal estate, would have given two of the children a larger inheritance to the detriment of the remaining three. *Id.* at 729, 734. In holding that the children took the properties subject to their respective mortgages, in contradiction of the general rule, the Supreme Court of Virginia determined that the controlling clause of the will could not be the one dealing with payment of just debts out of personalty because "it [was] inescapably obvious and indisputable that the testator, however short he [had] fallen in accomplishing his intention, designed and endeavored to divide his estate among his five offspring equitably and equally." *Id.* at 733. Instead, the Court gave effect to other will clauses that clearly showed the "testator regarded all of his children with equal affection" and intended for them to share equally in his estate. *Id.* at 734-35. As a result, the Court declined to apply the common law doctrine of exoneration, stating "[i]t is the intention of the testator, *however arrived at*, that is the chief concern of the court, and that intention, when once determined, will prevail, *even though the technical refinements of the law must be sacrificed*." *Id.* at 732 (emphasis added).

"The rule is elementary that the intention of the testator is the polar star which is to guide in the interpretation of all wills, and, when ascertained, effect will be given to it unless it violates some rule of law, or is contrary to

public policy. In ascertaining this intention, the language used, and the sense in which it is used by the testator, is the primary source of information, as it is the expressed intention of the testator which is sought." *Conrad v. Conrad's Executor*, 123 Va. 711, 97 S.E. 336 (1918).

Mr. Dolby's will states at Article 1.3: "my Executor shall not be required to pay prior to maturity any debt secured by mortgage, lien, or pledge of real or personal property owned by me at my death, and such property shall pass subject to such mortgage, lien, or pledge."

The attorney who drafted the will testified that this language is boilerplate language he puts in every will and that he and Mr. Dolby did not discuss the import of this clause.

I do not think it is wise to disregard language of a will simply because it is boilerplate language. Although this language might be boilerplate that the drafter puts in every will, it is equally true that this language expressed Mr. Dolby's intent and thus there was no reason for them to discuss it.

At trial, I questioned one of the children about her relationship and all the daughters' relationships with Mr. Dolby. Although Mr. Dolby spent more time with his new wife than he formerly spent with his daughters, there was no indication that there was any discord between Mr. Dolby and any of his daughters.

There is no evidence that Mr. Dolby intended for Mrs. Dolby to have the house and then to have his children from his first marriage pay the mortgage on that house thereby leaving them with very little from his substantial estate. To rule that he so intended would be contrary to the evidence.

For these reasons, I find that the Washington Mutual mortgage is not an obligation of the Estate. Mr. Dolby's estate plan has been given its proper effect.